Good morning. I represent Ms. Pearson. She was a long-time employee of the City of Augusta and I'm going to start the substance of my argument with the due process argument and the retaliation that all occurred between December 2011 and the May 2nd demotion. It's our position that the District Court erred in not applying Loudermill straightforward in some of the subsequent 11th Circuit cases that applied straightforward without McKinney v. Pate because in this case on May 2nd, Ms. Pearson was summoned to a meeting and Mr. Shanahan handed her a letter saying you're demoted from a position of an operations manager to a laborer. No notice to her that she might be demoted. Essentially, you can get half her pay from a position of a manager to a laborer and there was no And Georgia has no remedy for that, no State Court remedy. Under McKinney v. Pate, your The demotion claim happened, the demotion happened immediately and you could not have gotten a mandamus to make him do that, provide notice and opportunity But you could have gotten a remedy to require them to do it over with proper notice in a hearing under Georgia law. We've held that. I mean, we've been wrong all this time? I think that under Loudermill, it's straightforward. We don't have to exhaust our Georgia remedies. We're entitled to Loudermill to be applied. It's not just an exhaustion. McKinney v. Pate provides that if the State provides a procedural remedy, because by definition, you've got a procedural remedy in State court and therefore there's no violation of procedural due process. Okay, this policy manual said that you only get a review by an administrator subsequently. You can't then take that demotion, you can't take demotion to court. If this had been a termination, yes. But to the extent that Georgia law says you can take procedural violations to State court, then anything in a manual, employment manual, doesn't matter. You've got to pursue your State court procedural due process remedies. I don't know how else to put it. That's the genius, for want of a better term, of McKinney v. Pate. I think the distinction is that those cases in which there wouldn't be a meaningful opportunity to do that and the right has been deprived. Now, the State is talking about Loudermill, that you say part of Loudermill survives. But in point of fact, the pre-adverse action process that a person, you argue, is entitled to is necessarily not terribly formal, even under Loudermill. And so your client had noticed, they had been talking about this for two to three months. She had been confronted with the fact that notwithstanding having been told 10 years before she couldn't take this comp time, that she kept doing it and she kept doing it off the books. And she was allowed to give her explanation. And it perhaps wasn't a formal hearing with a judge, but certainly, would you agree, she had been confronted with what they were concerned about and had given her response? Well, there's two parts to the notice. One is how serious will be the punishment so that you could assert, she could have asserted, every exempt person in the department accrued and took comp time. She was not given that notice. Yes, there was an issue about the comp time process. Well, Loudermill doesn't require that. She just has to be told what they think she did wrong and given a chance to say her side. I think that Loudermill does require that she be given notice of the seriousness of the punishment so she can proffer why that outcome would be a denial of due process or totally unfair. It isn't just notice of what she did wrong. It's also mean it has to be notice of what the punishment might be so that she can respond to that. You don't think a person that had been confronted with this 10 years before and said, don't do it again. And for the next 10 years, every week of her job had been doing the same infraction, had some sense that there might be some punishment in the offing? She didn't get fired for it. The whole department since 1999, under the direction of the department director, was given comp time. That was the dirty little secret of the whole operation of Augusta. Every exempt person, manager accrued and used comp time. It continued after she got demoted in May of 2012. Every exempt person continued to get comp time, accrue and use. She is not a criminal. She is not the only one doing it. No. That was a department-wide policy to keep people in the rec department. In fact, when Tom Beck was before the commission. But your argument is she didn't have sufficient process to let her know she might be demoted. And my question to you was, they told her what they were concerned about. They had an exchange. They talked. She gave her defense. And I'm not understanding why that's not sufficient process. Even leaving aside what Chief Judge Carnes said about the fact there was post-termination process. The post-termination process that was followed within the department is one thing, and Chief Judge Carnes is making a separate point. There was, however, early in the investigation, a point at which Mr. Shanahan got the payroll books, went through them and said, Melinda, you're okay. He said this to Joni Smith, saying what you all were doing was fine. So this was just a pretext to use against her to demote her once she challenged it. We had all the, we had all the. And you have no quarrels with her post, well, I guess it's called post-demotion process. You have no quarrels with that. She had an administrative hearing, correct? No, that administrative hearing was just a review without anybody ever really reviewing the evidence. So you have a problem with that one as well? Yes, as to how it happened and the substance of it. Because the city administrator said, oh, I thought Mr. Shanahan had reviewed the evidence, and he was just there to review Shanahan's decision. So no one ever really reviewed the evidence. Isn't your argument that the process they gave her was too late? My understanding was your contention was that the decision, her demotion was effective May 2, and so the act was taken before she had a chance to engage, and that the rationale for pre-deprivation process in Loudermill is give the employee knowledge of what the charge is, let the employee come in, because maybe they can talk the agency out of the action and save all the later problems. Yes. And you can't, if you're going to allow it to happen, if you have only a post-deprivation remedy in State law, you can't ever go back and give the agency the opportunity to decide not to take the action? Correct. It's water under the bridge. The damage has been done. You can't run to the court to get it. Except McKinney said that when somebody doesn't get the pre-deprivation process that Loudermill entitles them to have, that's a deprivation, but it's not a violation of procedural due process until and unless the State is not willing to provide a remedial procedure to correct that by either money or reinstatement or whatnot. I mean, McKinney didn't say in post-deprivation, this is the law. He said pre-deprivation or post-deprivation, it doesn't become a constitutional violation, procedural due process, unless and until the State doesn't provide a remedy. And we held on cotton in other cases that the State of Georgia provides a remedy for pre-deprivation or for pre-adverse action through mandamus. The adverse action had already occurred. I know. What we said in McKinney, it provides a remedy for getting it undone. And that's all that procedural due process requires. Now, that may be wrong, but it's an en banc decision that's binding on us. All right. I, I, I read Loudermill to say that if, if the damage can't have been corrected in a meaningfully way in a meaningful time. Well, do you, the question is, do you read McKinney differently? That's the question the Chief Judge is putting to you. I read McKinney to, to, to not impose. I, I, I would say what you're saying is imposing an exhaustion requirement. No, no, no. I understand that. What it says is you can exhaust or not. You can exhaust and lose. And that's still not a procedural due process violation because you had a remedy. It didn't remedy anything in your view because you lost. But you don't have a right to win. You just have a right to the remedial procedure. We've used your time. Yeah, we do. Six minutes on reply. All right. Ms. Smitherman. If it please the Court, Jody Smitherman on behalf of Augusta, Georgia, Fred Russell, Bill Shanahan, and Sam Smith of Appalachia in this case. You're talking fast. Yeah, yeah. I apologize. Slow down. Yeah. I believe that the Court nailed this directly on the head in this case in that it is Augusta's position that twofold, one, that appellant in this case, Melinda Pearson, did receive sufficient procedural due process, both pre-adverse action and post-adverse action. But additionally, even if the Court were to find that she did not or had not, that she had the mandamus action provided to her by the State of Georgia, which she did not take advantage of. In this case, there was an ongoing investigation with regard to the time card fraud allegations. Plaintiff admitted that she was aware of the allegations, aware of the investigation. When exactly? When was she demoted? She was demoted in May of 2012. What date? And I believe in the proposed findings of fact, Pearson said, I was demoted on May 2, and you agreed with that assertion of fact. Your Honor, it became effective on May 2, 2012. She was provided a notice of proposed disciplinary action on May 2, 2012, and that was never, she would never respond to that, what she did. So she was, she had been removed as of the date that the May 2 letter was sent to her? She had not been removed, Your Honor. When was she removed? I mean, pardon me, demoted, not removed. Yes, in the meeting as of May 2, she was then demoted thereafter that meeting. And so the demotion became effective May 2, but she had not been demoted yet as of the date. When actually was she, on May 2 she was demoted? I believe that she started in the newer classification the following working day. I mean, when was the, when was the date done on the, when was the effective date of the demotion? The effective date of the demotion ended May 2. May 2. Yes, sir. And remind me what day the administrative hearing was. I apologize, Your Honor, that I don't have that. It was shortly thereafter in May that she had her administrative hearing in front of the Senate. The Senate for the 14th, I think, didn't they? Yes, Your Honor. She responded on the 5th with her letter. Correct, Your Honor. She, she admitted in her, in her brief that she filed an appeal, that she was able to submit over 100 pages in documentation to support why she should not have been demoted. She replied on May 7, and on May 16, the agency said, we're going to have a hearing on the 24th. Yes, Your Honor. But so as of, as of the date of May 2, she hasn't, has she been, has she been given the notice of why this is happening to her before the action was taken? Your Honor, there's, there's, she was talked to several times throughout the investigation as to why the, why potential action would be taken. In this case, we have what, how state law fits into. Well, what I'm trying to get at is if, if Loudermill applies, if McKinney doesn't wipe out Loudermill rights, then she is entitled to notice of an action to be taken against her before it happens, right? So she can reply. Correct, Your Honor. How did she have an opportunity to reply if the action was taken on the 2nd? She was given the opportunity. She was given the notice of proposed disciplinary action on May 2nd. She never responded to that notice of proposed disciplinary action. She responded on the 5th. And, excuse me? She responded on the 5th. She filed an appeal on the 5th. Well, she, she was told that if she had any objection, she could, she could respond within five days, right? That's what the letter says. And, and she did respond within five days. And then she had her administrative hearing. But she'd already been removed. Pardon me. Already been demoted. By the time she filed her explanation, her defense, the act had been taken. She had been placed in a lower position. Yes, Your Honor. So there was no chance that they would change their mind. The action had been, the demotion had happened. There is a chance that they had, had changed her mind in, in twofold. One, you have, she could have gone to the court, the state court, and asked for a mandamus requiring that the demotion be held off prior to her having this hearing. Secondly. Or that she be reinstated. Or that she be reinstated. And that in, when she had been. Forget the mandamus internally. Administratively, five days she answers, and the administrative judge agrees whether she's back doing her old job. Correct, Your Honor. In this case, she had an administrative hearing in front of the administrator who considered. She was temporarily in another position, but could well have gone back to her original position. Yes. If, if the administrator had found in Ms. Pearson's favor, she would have, at that point, the demotion would have been overturned. She would have been put back in her position. Go fast again. Slow it down. Thank you. She would have been, had the administrator, Fred Russell, agreed with and found that Ms. Pearson's over 100 pages of documentation supported the claim that she should not be demoted, she would have, in fact, been placed back in the previous position and would have been awarded back pay for that time period. And in this case, instead, after that administrative hearing, the decision to demote was, in fact, upheld. And at no time in this process did Ms. Pearson ever go and seek mandamus, claiming that the process that she was given was insufficient. She had been given some process throughout the entire investigation, as well as through the demotion process. And in this case, we do have to consider how state law fits into this, because we do have a, you know, a personnel manual that is an ordinance that specifically states that her actions can lead to, will lead to disciplinary action up to termination. So she did have notice that her actions could lead up to termination. In this case, the court correctly pointed out previously that she had been warned on multiple occasions that she did not have any right to accrue comp time. She did not have the right to use any comp time, not only 10 years earlier when she attempted to use it and they told her then, but most recently when she was out on leave between May of 2012 and December of 2012, Ms. Pearson, when she was out, tried to use comp time again and was again told by both human resources, the finance department, that you are an exempt employee and you don't have any comp time to use, which is why she was allowed to use catastrophic leave. The connection of, or the fact that exempt employees don't have the right, regardless of what the actual practice was, don't have the right to comp time is tied into the purpose of comp time, which is to avoid violating the FLSA. Is that the deal? In other words, you can't work people more than 40 hours a week unless they are exempt and when we say exempt, we are talking about exempt from the FLSA. The FLSA, the courts have said, well, that is actually regs that hold you can provide comp time to non-exempt employees rather than paying them overtime for working more than 40 hours one particular week or more than 80 hours in two weeks, et cetera. The reason she was not, the reason the exempt employees weren't given it is that the employer didn't have to in order to comply with the FLSA. Correct, Your Honor. As an exempt employer, employee and employer, you have the blessing and the curse of being worked as much as the employer needs to complete the task. My point is it is not exempt from comp time. It is exempt from the FLSA overtime requirements, which the employer connected to whether you were entitled. The non-entitled are they exempt from the FLSA? Correct, Your Honor. I think it is important to point out, as the Court did, that plaintiff had previous notice of her violations and continued to engage in this behavior. Because I believe on, when the appellant comes back up here, he is going to try to make maybe some arguments on the Title VII claims and FLSA claims and other claims, specifically as to comparators. And one thing that is very important to note that makes plaintiff completely different than any other alleged comparator that she has is this prior engaging in this bad behavior, prior being told several times that you cannot do this and then yet continuing to engage in this behavior. So from that perspective. But unless the Court has any other questions as to, I will. We don't. Thank you. Mr. Batson, under our procedures, you are confined to the issues that you raised in reply to any other argument of issues, any other issues. So we are on the procedural deprivation, which I gather to be is your primary, although not exclusive, point on appeal. And we will consider the other points on the briefs. Okay. I had reserved those gender, race and all that at the outset of my statement to get to the due process. But she didn't have an opportunity to respond. Yes, I understand. I won't go into the gender, race. The, for comparators, under Lewis, the issue is, are the comparators material for the issue at hand? The issue at hand is whether all exempt employees, all management employees in this department were, as a matter of department policy, longstanding and existing that demotion into the summer in a meeting with Shanahan and the other employees, this is how we will do exempt comp time. All management employees got comp time by a benefit of employment, which the employer may bestow so they don't have to pay more, take public tax dollars and pay higher salaries so that when people are working these special events and working 100 hours a week, they can take comp time. Now, the comp time that she accrued and that was used and that was in dispute was accrued in 2011. She goes out with MRSA because she contracted an infection from crawling underneath the house. So, Mr. Beck, the director, wanted to use the internal rec department comp time, wanted to use the internal rec department comp time to get her some paid leave so she could pay her insurance in August. Mr. Beck sent that letter downtown. Downtown knows they don't keep on the books the comp time that's up there because someone might then claim when retiring, you owe me money for the comp time that the rec department gives as a matter of a blessing oblige. So, that's why we have a dual system going on. So, she comes back in 2011 December. She starts trying to write up Sam Smith, gets in the argument. She is granted four days leave. Her supervisor granted that leave. There's no dispute that the supervisor approved the use of that leave. The way the leave would work is your regular time card for downtown is going to show you're working and you're going to get paid for it but you're actually off and it's approved by the director of the rec department. The city policy manual says you shall follow the orders of your supervisor. That, functionally, is the test of what employment is. You look at the actual workplace and how things are actually done. The policy manual says follow your supervisor as a practical matter. Employees do what their supervisors tell them to do. She did not do anything different than anything any other exempt employee did. Accrue the comp time that was given by the director in that department. And it continued after the demotion. After the demotion. And so when she shows up on May 2nd, she is read the letter by Mr. Shanahan. You are demoted. Now, here's your letter. You're demoted. That's it. Bingo. She's done. She then shows up as a laborer. She's assigned to work as a laborer. And on May 13th, I think it is, she's assigned to work on her hands and knees, chip and tile. And then she injures her back. And then she finds out when she's out of work and Shanahan's thinking he can get rid of her, he goes ahead and tells all the other exempt employees, yes, you can use this accrued comp time, but please try to do it within the two weeks that you accrue it. So the pattern of continuously approving the use of comp time for other exempt employees puts her squarely with people who did not get punished for using an accruing comp time under Shanahan, who became, who was the assistant sanity manager. He became the interim HR director and he was the head of the rec department after they fired Tom Beck. Now, Tom Beck can be fired by the commission and for any reason or no reason at all of their pleasure. He asserted before the commission, the comp time, that that was the issue before the commission, the comp time. That's what he argued. But there are a lot of other racial things going on over there. How many other exempt employees were there? There, we have evidence of Shoyer, Smith. There are four others like that. We have a list. There's a list of them in the brief. You'll see where you find the name Chris Shoyer, you'll have the other names there too. And so those are the exempt people. And I think Mr. Houck was exempt also. But if you'll see the name Shoyer, Lamb perhaps. But there are four others who we listed as exempts. So those are the people whose testimony will show. There's a footnote, page 16 or footnote number 16, where we talk about accruing and using. And a Ms. Osborne used comp time. She went out five days on comp time, on this, oh bless a bleach, comp time. So it was a term and condition of a public employer's employment that was critical to the operation. Even the city manager admitted and knew that the rec department did this because they insisted that they wanted to put on class A events. Okay. Thank you. Counsel, we'll take that case under submission. And we're going to take a 10 minute break here before we get to the final case.